In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-3864 & 12-1695

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANTE JONES and ROBERT R. BROWN,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 11-CR-52 — **J.P. Stadtmueller**, *Judge.*

ARGUED MARCH 1, 2013 — DECIDED JANUARY 9, 2014

Before ROVNER, WILLIAMS, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* On November 1, 2011, a jury found
Robert R. Brown guilty of armed bank robbery under 18 U.S.C.
§§ 2 & 2113(a) and (d), and brandishing a firearm in connection
with a crime of violence under 18 U.S.C. §§ 2 and
924(c)(1)(A)(ii). Those charges stemmed from the armed
robbery of the Guaranty Bank in Milwaukee, Wisconsin, on
October 21, 2010. Dante D. Jones acknowledged participating
in that robbery as a getaway driver, but the government agreed
to drop that charge against him as well as the charge in a

second bank robbery, and to prosecute him only on a third bank robbery charge, and Jones testified against Brown in Brown's trial for the Guaranty Bank robbery.

Brown appeals his conviction arguing that the court allowed the government to introduce expert testimony as lay testimony, that the jury instructions reduced the government's burden of proof, and that improper closing argument statements by the government denied him a fair trial. Jones, who pled guilty to reduced charges, appeals only his sentence. This court *sua sponte* consolidated both appeals.

The central issue in Brown's trial was whether he was one of the two men who entered the bank on October 21 and robbed it. The testimony at trial as to the identity of the perpetrators consisted primarily of Jones' testimony, but also included testimony from the witnesses at the bank at the time and videotapes of the incident. That testimony established that two men entered the bank on October 21, 2010, wearing hats or hoodies, as well as masks or clothing over their faces that revealed only their eyes. Both men wore gloves, and accordingly there was no fingerprint evidence identifying the perpetrators. Because of those efforts to conceal their identities, bank employees could provide only general descriptions of the height, race and ages of the offenders. One of the men brandished a gun throughout the ordeal.

After entering the bank, one of the men shouted for everyone to get down. As one of them jumped over the teller counter, the other pointed his gun at bank employee Alice Paeglow. Paeglow handed money from her register over the counter to the man with the gun. The man behind the teller

counter removed money from two drawers, handing at least some of that to his accomplice. Bank teller Stephanie Arndt testified that her register contained a dye pack as well as "bait money." She testified that a dye pack looks like a pack of $20 bills but contains a sensor that causes it to count down after it exits the bank and then explode, spewing red dye and causing burns. Paeglow also testified that Brown retrieved the dye pack along with cash from her drawer. The assistant bank manager Mariam Qteiry testified that at some point the man behind the counter (identified by Jones as Brown) placed his hand into his left pocket, and the videotape from the bank surveillance cameras also showed him stuffing something into his left pocket as he left the bank.

Jones testified that he and Brown met with Lorenzo Lardydell on the morning of the robbery with the intent to purchase marijuana, when Lardydell said he was going to rob a bank and urged them to join him. Jones testified that the plan was for Lardydell to hold the gun and for Brown to hurdle the counter and grab as much money as possible, and after viewing the surveillance video from the bank Jones testified that the robbery proceeded according to that plan. Lardydell had a mask and Brown had torn his shirt to make a face-cover for himself. Jones further testified that when Lardydell and Brown exited the bank, Lardydell was carrying the bag and it began to smoke. They entered the car with the bag still smoking, but as tear gas began to build up Lardydell threw the bag from the car. Lardydell left the car later in order to try to retrieve the bag, and Brown and Jones drove away. Jones testified that approximately 12 blocks north and 2 blocks east of the bank, Brown began to throw money out of his pocket

because his pants were essentially on fire. The dye pack had apparently exploded in his pocket where he had stuffed some of the money from the teller drawer. They continued driving to the home of Brown's sister, at which time Brown showed Jones a grapefruit-sized blister on the thigh area of his left leg.

Consistent with that testimony, the police recovered a dye-stained messenger bag containing money, a gun, and a dye pack with part of the words "Guaranty Bank," from a street immediately west of the bank. They retrieved the second dye pack from an alley approximately 14 blocks away from the bank. The government also introduced the testimony of Detective Ralph Spano, who participated in the investigation of the case. Spano testified regarding the firearm from the robbery and the number of associates with whom Dante Jones committed crimes, and also provided testimony regarding the characteristics of dye packs. In part, Spano testified that a dye pack contains a timing device that can be set to detonate between 10 to 30 seconds after it passes the bank's exit, and that the timing of the detonation is dependent upon the environment of the bank to ensure that it explodes shortly after the exit to create witnesses that are outside the bank. Spano also testified that upon detonation the dye pack instantly burns at about 400 degrees and releases smoke, tear gas, and red dye. When asked if he had ever personally observed a situation in which a dye pack detonated near a person's skin, Spano responded that he had seen that three to five times in his career and he described his observations. He stated that he had seen people stuff the dye packs down their pants and suffer very badly burned genitalia, place them in the side pants pockets in which the dye packs burned through the inner lining of the

pockets and burned their legs, and position the dye packs in large puffy jackets where the packs burned through the jackets but not the inner clothes which were stained with the dye.

The government subsequently introduced photographs of Brown's left leg, but no government witness testified that the marks on his leg were burn marks. Brown, however, produced a witness who testified that he burned that leg when a firework hit him at a family picnic at a park.

Brown also challenged Jones' credibility by presenting evidence to the jury that Jones had a powerful incentive to implicate him in the robbery. Jones was implicated in three bank robberies, and testified that the government did not charge him in two of those robberies, including the Guaranty Bank robbery, dropped one of the two charges in the third robbery, and agreed to recommend a lower sentence for that remaining charge. In addition, Brown demonstrated that Jones lied to the police when he spoke with them about the robberies in March 2011, in that he told the police that Brown was at the house when he and others were planning a different robbery, but in fact Brown was in custody on an unrelated matter on that date. Jones also acknowledged that when he initially spoke to the police he could not immediately recall which leg Brown had burned. Finally, Jones acknowledged that while speaking with the police in March 2011, he learned that Brown was the person who implicated Jones in a previous armed robbery involving Jones' friend, which had resulted in Jones' losing a number of close friendships, and that he was angry about that situation.

Brown first argues that this court should vacate his conviction because the district court erred in allowing Detective Spano to testify as to the nature of dye packs. Brown asserts that Spano thereby presented expert witness testimony without complying with the evidentiary rules cabining such testimony—specifically Federal Rules of Evidence 701 and 702.

Rule 701 provides that "a witness who is not an expert may offer an opinion when it is: '(a) rationally based in the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *United States v. Mendiola*, 707 F.3d 735, 741 (7th Cir. 2013), quoting Fed. R. Evid. 701. Where testimony is based on specialized knowledge within the scope of Rule 702, it has to comply with some safeguards of expert testimony, which include a requirement that such testimony be disclosed to the defendant prior to trial. See *United States v. York*, 572 F.3d 415, 421 (7th Cir. 2009); Fed. R. Crim. P. 16(a)(1)(G). Therefore, the initial question is whether the testimony crossed the line to expert testimony.

Because no objection was raised at trial to Spano's testimony, we review only for plain error. In order to meet that standard, Brown must demonstrate an error that is clear or obvious, that affected his substantial rights in that he probably would not have been convicted absent the error, and that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012).

The government concedes that Spano was a dual capacity witness in that some of his testimony regarding the nature of dye packs could fall within Rule 702. See *Id.* at 712. We agree, but a more precise delineation is necessary because not all of the testimony relating to dye packs falls within Rule 702.

We have discussed in numerous opinions the differentiation between lay and witness testimony. Lay testimony is based upon one's own observations, with the classic example being testimony as to one's sensory observations. *Mendiola*, 707 F.3d at 741. In *Mendiola*, we stated that the Rule 701 standard is essentially an importation of the personal knowledge requirement. In contrast, testimony moves from lay to expert if an officer is asked to bring her law enforcement experience to bear on her personal observations and make connections for the jury based on that specialized knowledge. *Christian*, 673 F.3d at 709–10. This differentiation arises frequently in cases in which officers testify as to the meaning of code words used in drug transactions. See, e.g., *United States v. Moreland*, 703 F.3d 976, 983 (7th Cir. 2012); *York*, 572 F.3d at 420. In order to avoid detection, participants in illegal drug transactions typically do not directly refer to drug names or the amount of money involved. Officers in subsequent criminal trials therefore are often called to help interpret for the jury the meaning of the words used in the tape or phone recordings. We have held that where the witness's testimony is based upon his own interactions with the parties in the course of the investigation, then it is based on personal knowledge and constitutes lay testimony. *Id*. Where, however, it is based upon the officer's experience over the years in narcotics investigations, and the officer is providing an opinion based on that experience as to what the

code words mean in the present transaction, then it is expert testimony. *Id*. We have held that such testimony which goes beyond the observations that a normal person could make, and is based instead on the specialized knowledge obtained through experience in the field, must meet the requirements of Rule 702 as expert testimony. *York*, 572 F.3d at 420; *Sanchez v. City of Chicago,* 700 F.3d 919, 930 (7th Cir. 2012).

Applying those principles to the testimony of Spano yields a mixed bag. There is no dispute that in testifying as to the investigation itself, Spano was a lay witness. Brown asserts, however, that Spano's testimony regarding the dye packs was expert testimony and that the government failed to follow the requirements for such testimony in that it failed to disclose it and failed to properly qualify Spano. As to some such testimony, we agree. Spano testified that the dye packs were all manufactured by one company, that they contained a timer which could be set to detonate the dye pack within 10 to 30 seconds of exiting the bank, that the dye packs instantly burned at 400 degrees, and that timers were set based upon the environment of the bank so as to ensure they would go off shortly after the exit from the bank so as to maximize the possibility for witnesses outside the bank.

That testimony was based on technical, specialized knowledge obtained in the course of his position, and was not based on personal observations accessible to ordinary persons. Accordingly, it fell within Rule 702, and the government should have qualified Spano as an expert and followed the disclosure rules prior to soliciting that testimony.

Spano also was asked, however, whether he had ever witnessed the aftermath of a dye pack exploding near a person's skin. Spano then testified that he had observed that situation on three to five occasions. Among those, he testified that he had observed burns to the leg or genital area caused by dye packs stuffed down pants or placed in pant pockets, and a burn through a large puffy jacket caused by a dye pack detonating in it. That testimony was nothing more than Spano's recollection of personal observations. It was in fact precisely the type of sensory observations specifically identified as lay testimony in Rule 701. There is nothing in that testimony that reveals opinions or knowledge that could not equally have been observed by other persons in that situation. The government could have ventured into the territory of expert testimony here if it had gone one step further and solicited an opinion as to the nature of Brown's scars on his leg. If the government had showed the picture of the leg and asked Spano if based on his observations of past dye pack incidents, those scars were of the type that would be caused by a dye pack exploding, then that would have been the type of testimony dependent on specialized knowledge and experience that falls within expert testimony. The government did not do so, and in fact Brown acknowledges in his brief that the government did not present any testimony that the scars on his leg were burns of any sort. The testimony by Spano concerning burns caused by dye packs was therefore proper lay testimony, and the district court committed no error in allowing the testimony to be presented.

The question, then, is whether the introduction of the admittedly expert testimony as to the nature of dye packs was

itself enough to constitute plain error. We need not consider whether the error could be considered plain, because Brown cannot demonstrate that he would not have been convicted absent the error, or that the introduction of that testimony without complying with the expert testimony requirements resulted in a miscarriage of justice. First, Brown does not argue that Spano—who testified to having investigated between 800 and 1,200 bank robberies in his career—was actually unqualified, nor does he question the validity of the information as to the dye packs concerning the timers or the heat produced by the packs upon detonation. In other cases, we have held that the failure to raise any such challenge was itself enough to end the matter. See *United States v. Tucker*, 714 F.3d 1006, 1016 (7th Cir. 2013); *York*, 572 F.3d at 422. In fact, Brown even knew the nature of the testimony that Spano would provide, because the government had given Brown the exhibit concerning dye packs that it intended to introduce during Spano's testimony, thus fulfilling some of the same purposes as the disclosure requirement. We need not rely on those grounds, however, because, more significantly, none of that evidence was damaging to Brown, and certainly none of it was so damaging as to constitute error that is plain and that resulted in a miscarriage of justice.

The harm alleged by Brown centers on the testimony that dye packs contain timers that can be set to different times, and that they burn at 400 degrees. The latter point is harmless here because, as we have already held, Spano's testimony as to his observations of burns caused by exploded dye packs was permissible lay testimony. Moreover, teller Stephanie Arndt also testified without objection that dye packs possess sensors

which initiate a countdown when they exit the bank, and that the dye packs spew red dye and cause burns when they explode. Thus, the problematic testimony by Spano added little to the case. The precise degree at which the dye packs burn was not of enough significance to have potentially impacted the verdict. The testimony as to the timers was not similarly cumulative, but it also was harmless error. In fact, that testimony was helpful to Brown and was exploited by his defense counsel to Brown's advantage. Brown focuses on Spano's testimony that the timers could be set from 10 to 30 seconds, and argues that it provided support for the government's testimony that one dye pack exploded long after the first one. Spano testified, however, that the timer is set based on the environment of the bank, so as to allow the packs to go off at a point after the robbers exit the bank to maximize the potential for witnesses. Spano never testified that timers for one bank would be set at two different times, and in fact his explanation as to how the timing was determined would argue against different timing on dye packs for the same bank environment.

Brown's counsel explored that line of reasoning in cross-examining Spano, obtaining testimony from Spano that supported an argument that the timers would have detonated close in time to each other immediately after the robbers' exit from the bank, and not at the disparate times suggested by the government's version of events. Toward that end, Brown's counsel elicited testimony from Spano that: there was only one U.S. manufacturer of dye packs; the timer is set based on the environment so as to go off just after someone exited the bank's premises; the adjustment of the timer was based on that

environment; and because people witnessed the robbers running to the vehicle followed by a cloud of red dye, that indicated there was a fairly short time in which that timer device was set. He also established through cross-examination that red dye is almost impossible to remove from clothing, and that no one in the course of the investigation claimed to have seen Brown in red-dye stained clothing.

Accordingly, Brown's counsel elicited testimony from Spano confirming that the timer would be set based on the environment of the bank, so as to detonate shortly after exiting the bank, minimizing danger to those inside the bank and maximizing the potential for witnesses to the robbers' exit. Moreover, Brown's defense counsel referenced Spano's testimony in closing argument, not for the purposes of distinguishing it, but as support for the argument that the timers would be set based on the environment of the bank and would not have detonated separately. Because the testimony was at least as supportive of the defense position as that of the government, and in fact arguably much stronger for the former insofar as the timing issue, any errors in the inclusion of that testimony were harmless and could not have resulted in a miscarriage of justice.

Brown raises myriad other challenges to his conviction, none of which have merit. First, he argues that the conviction cannot stand because the jury relied on confusing jury instructions that improperly reduced the government's burden of proof. Brown acknowledges that this objection was not raised in the trial court, and therefore we review this claim only for plain error.

Brown asserts that an element of both of the charged offenses was using or carrying a gun, but that there was no evidence that Brown ever used or carried the gun in connection with the robbery. He argues that the jury instruction shifted the focus to the actions of his accomplice, allowing the jury to convict if he or his accomplice committed the elements of the offense, and using language of joint venture liability although Brown was not charged with conspiracy. Brown acknowledges, however, that a defendant need not commit each element of the charged offense personally, and that a defendant who knowingly aided and abetted the commission of the offense may be guilty of that offense to the same extent as the principal. He asserts, however, that the instructions did not adequately require the jury to determine that he knowingly aided the use of a firearm during the robbery. This argument is doubly flawed. First, as Brown admits, the district court issued an instruction concerning the knowledge necessary to aiding and abetting liability. Thus, there was no failure to adequately set forth the law. Second, the knowledge element was never in dispute in this criminal case, and therefore even if the instructions had been confusing as to that requirement, Brown could not demonstrate plain error. Brown's theory of the case was that he was not the person in the bank, not that he participated in the robbery but was unaware of the use of the firearm. Moreover, the firearm was brandished by the other perpetrator immediately upon entering the bank, and was visibly used throughout the robbery, and therefore there is no basis whatsoever for any argument that the co-perpetrator lacked knowledge of the firearm. See *United States v. Woods*, 148 F.3d 843, 847 (7th Cir. 1998). Thus, Brown could not

demonstrate any miscarriage of justice under the plain error standard.

Lastly, Brown challenges a plethora of closing remarks by the prosecutor, contending that those statements taken as a whole deprived him of a fair trial. Nearly all of those statements, however, are not improper and therefore we need not consider whether those statements, none of which yielded objections at trial, constituted plain error. For instance, Brown argues that no evidence was introduced at trial that the police relied on Jones' statements to obtain a search warrant to examine Brown's leg for burn marks, yet the government suggested as much in closing arguments. That is not a fair characterization of the prosecutor's statement. The prosecutor stated:

> Dante Jones knew that those—that that burn would be there. He saw the burn afterwards. He told the police what he saw. The police then get a search warrant and examined Mr. Brown; and lo and behold, Mr. Brown still bore the scars from that incident and from that burn.

Trial Transcript Volume 2 at 34. That statement does not indicate at all what was in the search warrant. It merely sets forth the trial evidence that the police spoke with Jones who informed them of the burn and that the police obtained a warrant to search Brown for that burn. The implication that Jones' statements formed the basis for the warrant is a natural one from the trial testimony, but the government does nothing more than set forth the evidence. Brown's attempt to character-

ize that as testimony without any basis in the evidentiary record is meritless.

Similarly, Brown argues that the government, without any basis in the record, asserted that Jones was "very clear" in his statements, when actually the trial testimony indicated that Jones was initially ambiguous as to which leg was burned. That is not prosecutorial misconduct; it is a proper argument to the jury as to the testimony the jury heard, and the jury could itself weigh whether the testimony was in fact clear or not. Those are the first two of many statements challenged by Brown, and the rest fare no better. With one exception, the remaining challenges represent similarly strained readings of proper closing arguments, and therefore do not present any basis for attacking his conviction under either his theories of prosecutorial misconduct or his theory that the prosecutor imposed an improper burden of proof. The record simply does not support any non-frivolous argument of such errors. We address only the arguable error.

Brown identifies one statement that constituted an improper expression of the prosecutor's personal belief as to a witness's credibility, in the following statement on rebuttal:

> You're going to have to assess for yourselves what you think of Mr. Jones and his demeanor. I thought he was—He seemed very candid. He said, for example, he said, there was a question, were you angry about what Brown had done. He said yes. He didn't say, well, no, that wasn't really anything. …

Trial Transcript Volume 2 at 46–47. The prosecutor erred in giving his own personal opinion as to whether Jones was

credible. In the context of the statement and the trial as a whole, however, that did not rise to plain error. First, the improper statement was couched in a discussion of what the evidence demonstrated as to Jones' credibility, rather than a personal statement based on the prosecutor's exposure to Jones as a person. Moreover, that was one statement in a series of points made by the prosecutor as to how the evidence supported Jones' version of events, and the focus overwhelmingly was on the trial evidence. The prosecutor also made clear at the same time that the jury was going to assess for itself whether Jones was credible. Finally, as Brown acknowledges, the district court instructed the jurors that the arguments of counsel are not evidence, that the jurors are the sole judges of credibility, and that their own recollection of the evidence controls. The sole improper statement was not significant enough to satisfy the plain error standard, and the other closing argument statements were arguments based on the evidence not expressions of personal opinion. Accordingly, Brown has failed to raise any viable challenge to his conviction.

We turn, then, to Jones, who pled guilty in the district court and raises only a challenge to his sentence in this appeal. Jones acknowledges that he was a career offender for purposes of determining the applicable Sentencing Guidelines range. As a career offender he faced a Guidelines range of 188 to 235 months. The district court, however, determined that it did not want to apply the career offender classification. Without the career offender consideration, Jones would have faced a Guidelines range of 100 to 125 months, and with a thirty percent reduction under U.S.S.G. § 5K1.1 for his substantial assistance to the government in other cases, he claims the only

reasonable sentence would fall within the 70 to 85 month range.

Jones errs as an initial matter in his argument as to the appropriate Guidelines range. By his own admission, Jones qualified for classification as a career offender, and therefore his appropriate range under the Guidelines was 188 to 235 months. The district court determined that the full impact of the career offender classification was inappropriate for him. That does not, however, negate it as a consideration, nor does it alter the Guidelines range to the lower amount. It is not, as Jones would assert, an all or nothing proposition. The court could determine not to apply the full amount of the career offender increase, but still consider that status or his criminal history in determining an appropriate middle ground. *United States v. Liddell*, 543 F.3d 877, 884–85 (7th Cir. 2008) (noting that the district court is free to reject the advice of the Guidelines, including the career offender guideline). That is precisely what the court did here, stating that although Jones technically ought to be sentenced under the Guidelines as a career criminal offender, the actual sentence should be tempered both by the grant of the substantial assistance departure under § 5K1.1 and the fact that the career offender status overstates what is appropriate. The court concluded that some incremental increase was necessary based on Jones' career criminal status, but not the full breadth and depth of the Guidelines increase. Weighing all of the factors, the court reached a sentence of 100 months. That is a proper exercise of the court's discretion, and is even less than the Guidelines range. See *United States v. Smith*, 721 F.3d 904, 908 (7th Cir. 2013) (noting that we apply a presumption of reasonableness to sentences

within the Guidelines range). Jones is simply wrong in suggesting that a reluctance to impose the entire career offender amount negated that factor from consideration at all. The court imposed a below Guidelines sentence, and Jones has failed to demonstrate that the sentence was outside the bounds of reason or that it was based on consideration of improper factors or a misapplication of the Guidelines. See *Smith*, 721 F.3d at 908.

Accordingly, Brown's challenge to his conviction and Jones' challenge to his sentence are without merit.

AFFIRMED.