**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: __January 12, 2016__

**NO. 33,247**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**MICHAEL VARGAS, SR.,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Teddy L. Hartley, District Judge**

Hector H. Balderas, Attorney General
M. Anne Kelly, Assistant Attorney General
Santa Fe, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

# OPINION

**WECHSLER, Judge.**

{1} Defendant Michael Vargas, Sr. appeals his convictions on each of twenty-four counts of intentional child abuse by torture, contrary to NMSA 1978, Section 30-6-1(D)(2) (2009). Defendant raises numerous issues on appeal, including (1) violations of his rights to due process and to be free from double jeopardy, (2) the insufficiency of the evidence to support his convictions, (3) prosecutorial misconduct, (4) improper admission of opinion testimony by a non-expert witness, (5) erroneous jury instructions, and (6) sentencing error. We are persuaded that expert testimony related to stun gun technology and the victim's injuries was improperly admitted through an unqualified lay witness. The admission of this testimony was not harmless and requires reversal of Defendant's convictions on all counts. Because of this ruling, Defendant's arguments related to erroneous jury instructions and sentencing decisions are moot.

{2} With respect to additional issues raised, our ruling affects Defendant's request for reversal due to prosecutorial misconduct. However, while prosecutorial misconduct may be so unfairly prejudicial that it bars retrial, Defendant does not request this remedy or develop such an argument on appeal. Because a finding in Defendant's favor would reduce the number of charges on retrial, we reach

Defendant's sufficiency of the evidence argument and conclude that it lacks merit. Finally, we hold that the twenty-four identical counts contained in the indictment lack the required specificity and constitute a violation of Defendant's rights to due process and to be free from double jeopardy. Because the evidentiary issue requires reversal of all convictions, we remand for a new trial with instructions designed to cure the due process and double jeopardy problems.

**BACKGROUND**

{3}     This case arose from allegations of child abuse by D.L. against Defendant, who was his foster father. The Children Youth and Families Department (CYFD) placed D.L. and his older sister L.L. with Defendant and his family in Clovis, New Mexico after the children were removed from their biological mother in Arizona. The children's biological mother was related to Defendant's wife. In late July or early August 2010, Defendant purchased a stun gun online that was delivered to the family's home.[1] In mid-October 2010, D.L. first reported to a school counselor that he was being abused at home. After consulting her supervisor and meeting with D.L. again on October 29, 2010, the counselor reported the allegations to CYFD. CYFD

---

[1] The attorneys and witnesses in this case use the term "taser" and "stun gun" and "tased" and "stunned" interchangeably when referring to the assaults on D.L. For the purposes of continuity, we use the term "stunned" to describe the assaults and the term "stun gun" rather than "taser" to describe the device.

conducted its own investigation and removed both children from the home the same day.

{4} Accounts of the use of the stun gun on D.L. between early August and October 29, 2010 vary. Testimony by D.L. indicated that he was stunned repeatedly by Defendant and Defendant's sons Mikey and Brandon over the course of three months. When asked on direct examination specifically how many times he was stunned, D.L. did not know. He did testify, however, that (1) Defendant stunned him more than 24 times, (2) Mikey stunned him approximately fifteen times, and (3) Brandon stunned him approximately three times. D.L. then testified on cross-examination that he counted to himself each time he was stunned, but he stopped counting at twenty-four times even though he was stunned more than twenty-four times. He further testified that Defendant personally stunned him less than twenty-four times.

{5} D.L.'s testimony indicated that the incidents took place both at Defendant's home, where most of the family members resided, and at Mikey's home. D.L. testified about two specific incidents, including one when he was stunned on the arm by Mikey on the day the stun gun arrived in the mail and another when Defendant stunned D.L. while the family was visiting at Mikey's house. He testified that he asked Defendant and Mikey not to stun him and that Defendant would laugh when Mikey stunned him. D.L. also testified that most of the marks on his body during his

3

police interview were the result of mosquito bites, although certain specific marks were from the stun gun.

{6} Testifying on behalf of the State, L.L's testimony generally corroborated the pattern of abuse against D.L. by Defendant and his sons, although there were significant inconsistencies between her direct and cross-examination testimony. L.L. initially stated that she first saw D.L. stunned by Mikey at the family's house on the day the device arrived. On cross-examination, L.L. first testified that D.L. was stunned on two different days in October: once by Mikey in the kitchen of the family's house and once by Mikey at Mikey's house when the family went over for a visit. L.L. then testified that Defendant first stunned D.L. while sitting on the couch on the day the device arrived in the mail. After a brief recess, defense counsel again attempted to establish the sequence of events. At this point, L.L. stated simply that she could not remember all the specific incidents, that there were many incidents, and that they happened very fast. L.L consistently testified that she saw D.L. get stunned by either Defendant or his sons between ten and fifteen times.

{7} The State's final witness was Detective Rick Smith. Detective Smith stated that he had been a police officer for twenty-nine years, including as an investigator specializing in sexual assault and child abuse cases with the Clovis Police Department since 2007. Detective Smith also testified as to his experience with stun

guns similar to the one described by D.L. and L.L. Detective Smith was not offered or qualified as an expert witness on the topic of stun guns or the injurious effects of stun guns to humans. Detective Smith offered substantial testimony related to the operation of stun guns, the types of injuries they create, and the manner in which those injuries heal.[2]

{8}     Defendant testified that he purchased the stun gun online, gave it to his son Mikey, and never saw it again. Defendant also testified that he never stunned D.L. and was unaware if, or that, his sons were doing so.

{9}     Following a jury trial, Defendant was convicted of twenty-four counts of child abuse by torture.

**IMPROPER EXPERT TESTIMONY**

**Standard of Review**

{10}     Defendant claims that the district court improperly admitted expert opinions offered by Detective Smith as lay witness testimony under Rule 11-701 NMRA. Appellate courts review the admission of evidence for an abuse of discretion. *State v. Flores*, 2010-NMSC-002, ¶ 25, 147 N.M. 542, 226 P.3d 641. A court abuses its discretion when its evidentiary rulings indicate a misapprehension of the law. *State*

---

[2] We expand upon this testimony below because it forms the basis of one of Defendant's issues on appeal.

*v. Elinski*, 1997-NMCA-117, ¶ 8, 124 N.M. 261, 948 P.2d 1209, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, 275 P.3d 110. If Detective Smith's testimony was improperly admitted under Rule 11-701, that admission would indicate a misapprehension of our law and constitute an abuse of discretion by the district court.

**Preservation**

{11}     To preserve evidentiary objections, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon. *State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d 1280. Defendant objected to Detective Smith being allowed to testify in an expert capacity without qualification. Defendant's objection specifically stated that Detective Smith lacked medical training necessary to opine as to the cause of D.L.'s injuries. This objection was sufficient to put the district court on notice as to Defendant's assertion that Detective Smith was offering opinions that exceeded the scope of lay testimony.

**Admission of Detective Smith's Testimony as Lay Witness Opinion Testimony**

{12}     Our rules of evidence create a distinction between opinion testimony offered by an observer and expert witness testimony offered based upon expertise in the

relevant subject matter area. *Compare* Rule 11-701, *with* Rule 11-702 NMRA. Rule 701 states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is
>
> A.    rationally based on the witness's perception,
>
> B.    helpful to clearly understanding the witness's testimony or to determining a fact in issue, and
>
> C.    not based on scientific, technical, or other specialized knowledge within the scope of Rule 11-702 NMRA.

In contrast, Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

{13}    In federal courts, Federal Rule of Evidence 701 (Rule 701) governs lay opinion testimony and was amended in the year 2000 in order to "eliminate the risk that the reliability requirements set forth in [Fed. R. Evid.] 702 [(Rule 702)] will be evaded through the simple expedient of proffering an expert in lay witness clothing." Rule 701 advisory comm. notes, 2000 amends. The rule "does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*." *Id.* Under Rule 701, it "is possible for the same witness to provide both lay and expert testimony in a single case," but "any part of a witness's testimony that is based upon scientific,

7

technical, or other specialized knowledge . . . is governed by the standards of [Rule] 702." *Id.*

{14} New Mexico's Rule 11-701 is modeled upon Rule 701 and was amended in 2006 to guarantee application consistent with the federal rule. *See* Rule 11-701 Comm. Commentary ("The addition of Paragraph C in 2006 brought this rule into alignment with federal rule 701. This amendment was made to the federal rule in 2000 to avoid the misuse of the lay witness opinion rule as a guise for offering testimony that in reality is based on some form of claimed expertise of the witness. . . . If the witness testifies [as to] scientific, technical or other specialized knowledge, then the admissibility of such testimony must be analyzed under Rule 11-702 NMRA for expert testimony."). Since the language and intent of our Rule 11-701 mirrors that of Rule 701, we do not hesitate to look to federal court analysis of proper and improper lay opinion testimony. *Kipnis v. Jusbasche*, 2015-NMCA-071, ¶ 7, 352 P.3d 687, *cert. granted*, 2015-NMCERT-___ (No. 35,249, June 19, 2015) ("When the state and federal evidence rules are identical, we may rely on interpretations of the federal rule as persuasive authority.").

{15} Whether lay opinion testimony is admissible requires a two-step analysis. First, the court must find that the opinion is based on personal perception or personal observation by the witness. *Hansen v. Skate Ranch, Inc.*, 1982-NMCA-026, ¶ 22, 97

N.M. 486, 641 P.2d 517. Second, the opinion must be rationally based on the witness's own perception or observation. *Sanchez v. Wiley*, 1997-NMCA-105, ¶ 17, 124 N.M. 47, 946 P.2d 650. The content of such testimony "is generally confined to matters which are within the common knowledge and experience of an average person." *State v. Winters*, 2015-NMCA-050, ¶ 11, 349 P.3d 524 (internal quotation marks and citation omitted).[3]

{16}     The testimony of law enforcement officers presents a particular challenge to courts given that an officer's personal perception of events is often informed by technical or other specialized knowledge obtained through the officer's professional experience. The training and daily interactions undertaken by law enforcement officers are not part of the "common knowledge and experience of an average person." *Id.* ¶ 11 (internal quotation marks and citation omitted). However, law enforcement officers regularly make observations in the course of their professional

---

[3] Our appellate cases provide non-exhaustive lists of subject matter areas in which lay opinion testimony is properly admitted. *See Bunton v. Hull*, 1947-NMSC-005, ¶ 27, 51 N.M. 5, 177 P.2d 168 (listing "identity of persons or things; the age, health, physical condition, and appearance of a person; the lapse of time; the dimensions and quantities of things" as areas where lay opinion testimony is appropriate); *State v. Alberico*, 1993-NMSC-047, ¶ 45, 116 N.M. 156, 861 P.2d 192 (listing "circumstances involving value, voice and handwriting identification, sanity, or speed" as areas where lay opinion testimony is appropriate).

9

duties, such as the speed of an automobile, that are proper lay opinion testimony from either an officer or a casual observer.

{17} Our district courts perform the function of gatekeepers in order to ensure that properly admitted lay opinion testimony is not contaminated by improper expert testimony. *See, e.g.*, *State v. Downey*, 2008-NMSC-061, ¶ 25, 145 N.M. 232, 195 P.3d 1244 (describing trial judges as gatekeepers with respect to relevance and reliability of evidence). This Court has frequently determined the admissibility of non-expert opinion testimony by law enforcement officers. *See, e.g.*, *State v. Wildgrube*, 2003-NMCA-108, ¶¶ 12-15, 134 N.M. 262, 75 P.3d 862 (holding that officer's personal observation of the debris field from an automobile accident allowed testimony as to the nature of the accident); *Hansen*, 1982-NMCA-026, ¶¶ 21, 24 (holding that officer's personal observations made at a roller rink allowed testimony as to the absence of safety protocol); *State v. Gerald B.*, 2006-NMCA-022, ¶ 23, 139 N.M. 113, 129 P.3d 149 (holding that expert testimony is not required to identify marijuana); *cf. State v. Duran*, 2015-NMCA-015, ¶ 15, 343 P.3d 207 (holding that a forensic examiner's personal observations of child sexual assault victims did not allow lay testimony as to the behavior of victims generally). We reiterate that the content of lay opinion testimony is properly limited to "matters which are within the common knowledge and experience of an average person." *Winters*, 2015-NMCA-

050, ¶ 11 (internal quotation marks and citation omitted). When the line between lay and expert opinion is blurred during the course of a single witness's testimony, it is the proper function of the district court, as gatekeeper, to correct the error when raised.

{18}     *United States v. Jones*, 739 F.3d 364 (7th Cir. 2014), provides a comprehensive discussion of this principle. In that case, the defendant was charged with bank robbery. *Id.* at 366. The prosecution argued that the defendant participated in the robbery, that he placed bait money containing a dye pack in his pocket, and that the dye pack exploded causing a grapefruit-sized burn on the defendant's thigh. *Id.* at 367. On appeal of his conviction, the defendant argued that the trial court allowed improper expert testimony by the investigating detective under the guise of lay testimony. *Id.* at 366-67. The testimony in question related to the technical functions of dye packs and physical injuries caused by dye packs. *Id.* at 367. The prosecution did not offer or qualify the detective as an expert. *Id.* at 368. The detective testified that (1) a dye pack is designed to detonate between ten and thirty seconds after leaving a bank; (2) the purpose of this delay is to create witnesses outside the bank; (3) a dye pack instantly burns at approximately 400 degrees, releases smoke, tear gas, and red dye; (4) he had seen burns caused by dye packs three to five times during his

career; and (5) a dye pack can cause severe burns if it ignites in close proximity to the body. *Id.* at 367-68.

{19}     The Seventh Circuit held that the witness's testimony was comprised of both lay and expert opinions. In arriving at this conclusion, the court noted that

> [l]ay testimony is based upon one's own observations, with the classic example being testimony as to one's sensory observations. . . . In contrast, testimony moves from lay to expert if an officer is asked to bring her law enforcement experience to bear on her personal observations and make connections for the jury based on that specialized knowledge.

*Id.* at 369 (citation omitted).

{20}     The court distinguished the testimony in the following way. The detective's testimony about the specific functions of the dye packs—that is, the manufacturer, the workings of the timer, the purpose to create more witnesses, the temperature at which the pack burned—was "based on technical, specialized knowledge obtained in the course of his position, and was not based on personal observations accessible to ordinary persons." *Id.* In contrast, the detective's testimony about the aftermath of a dye pack exploding near a person's skin was simply a recollection of the detective's own sensory observations, which was proper lay testimony. *Id.* at 370. To emphasize the contrast, the court explained the manner in which the burn testimony would have crossed the line from lay to expert opinion, stating that

> [t]he government could have ventured into the territory of expert testimony here if it had gone one step further and solicited an opinion as to the nature of Brown's scars on his leg. If the government had show[n] the picture of the leg and asked [the witness] if based on his observations of past dye pack incidents, those scars were of the type that would be caused by a dye pack exploding, then that would have been the type of testimony dependent on specialized knowledge and experience that falls within expert testimony.

*Id.* Application of *Jones*'s distinction to Detective Smith's testimony indicates that Detective Smith's testimony crossed the line between lay and expert opinion testimony.

{21}     Detective Smith's testimony consisted of various details about stun guns and his opinion as to the cause of D.L.'s bodily injuries. The following exchanges took place on direct examination:

| | |
|---|---|
| D.A.: | [W]ere you able to determine or figure out what type of device these kids were talking about? You said they called it a taser. |
| Detective Smith: | They called it a taser throughout everything up to that point. What it looks like is it's an electronic stun gun. |
| . . . . | |
| D.A.: | How do you know so much about stun guns and tasers? |
| Detective Smith: | As part of my career I worked in the Santa Fe Police Department. I was assigned to the administrative division, and we did actually do some research on stun guns themselves to determine whether or not |

13

we wanted to utilize them as an alternate means of control.

D.A.: You've actually looked into these as part of your job?

Detective Smith: To some extent, yes ma'am.

D.A.: OK, and the stun gun, versus the taser, again, describe what a stun gun looks like.

Detective Smith: The stun gun is a contact weapon. In other words, you have to have it in your hand and actually make contact with the individual to utilize it.

. . . .

D.A.: You heard [D.L.] describe if he moved one prong would hit him. Does that seem accurate to you in your training and experience?

Detective Smith: Yes, the way it worked is that the nodules themselves, or the prongs, are live when the button is pressed and you can hold it up and discharge it and there's an electrical charge that will go back and forth between the prongs, but if you touch someone with it, one or both prongs can deliver the shock.

. . . .

D.A.: Have you ever seen what type of marks are left from a stun gun?

Detective Smith: The marks that I've seen on [D.L.] are extremely similar to the ones I've seen on individuals that have suffered stun guns.

. . . .

14

D.A.: So we've been talking about mosquito bites, does [the injury] look similar to a mosquito bite?

Detective Smith: I could see someone that wasn't familiar with them would think so, but they really didn't appear to be a mosquito bite because they didn't have the raised irritation that you would see from a mosquito bite, and then the angry red ring around it that would show on a mosquito bite. There's a round area that's very round. Mosquito bites, they come in a variety of shapes and sizes.[4]

. . . .

D.A.: I want to talk specifically about the difference in what your experience is as a law enforcement [officer] in a stun gun injury.

Detective Smith: The stun gun injuries, they're all consistently—when they hit in pairs, are the same distance apart. . . . The prongs of a stun gun are about . . . two-and-a-half inches apart. . . . And when they both hit they will make marks that are that distance apart. . . . But if you just hit a lone stud, or a lone prong at one point, it can leave a single mark on its own.

. . . .

D.A.: [B]ased on your experience in knowing what a stun gun does, how many pairs were you able to locate on his body?

Detective Smith: I counted up twenty-four pairs that appeared to be stun gun injuries.

---

[4] Defendant's objection to Detective Smith's lack of qualification as an expert was raised at this point in the testimony.

{22} As an initial matter, Detective Smith's testimony indicates that his experience with stun guns is based upon his law enforcement training and experience, rather than from life experience outside the law enforcement context. Therefore, any commentary by Detective Smith about the technical properties of stun guns, the nature of stun gun injuries and the manner in which they heal, similarities and dissimilarities between stun gun injuries and mosquito bites, and the distance between stun gun prongs, are not "matters which are within the common knowledge and experience of an average person." *Winters*, 2015-NMCA-050, ¶ 11 (internal quotation marks and citation omitted). Furthermore, Detective Smith's testimony crossed the line drawn in *Jones* in that he did not simply state that he had seen stun gun injuries, describe them, and allow the jury to draw its own conclusion. Instead, Detective Smith several times stated that the marks on D.L.'s body were the type that would be caused by a stun gun. Thus, Detective Smith's testimony was not simply commentary on observations he witnessed during the investigation, but instead he applied his law enforcement training and experience to "make connections for the jury" as to the cause of the marks on D.L.'s body. *Jones,* 739 F.3d at 369.

{23} We do not dispute the State's contention that Detective Smith's testimony was based upon his personal perceptions. However, we cannot agree that his characterization of these marks as stun gun injuries is one that a "normal person

16

would form on the basis of observed facts," *State v. Luna*, 1979-NMCA-048, ¶ 19, 92 N.M. 680, 594 P.2d 340, particularly when D.L. himself testified that many of the marks on his body were mosquito bites. As such, Detective Smith's testimony constituted expert opinion testimony and should not have been admitted under Rule 11-701.[5]

**Harmless Error**

{24}     The State alternatively argues that if Detective Smith's testimony was improper, its admission constitutes harmless error. Violations of the rules of evidence by a district court are non-constitutional errors. *State v. Marquez*, 2009-NMSC-055, ¶ 20, 147 N.M. 386, 223 P.3d 931, *overruled on other grounds by Tollardo*, 2012-NMSC-008. Non-constitutional errors are harmless unless there is a reasonable probability that the error impacted the verdict. *Tollardo*, 2012-NMSC-008, ¶ 36. To determine the likely effect of the error, courts must evaluate all of the circumstances. *Id.* ¶ 43. These circumstances include other evidence of the defendant's guilt, the

---

[5] We observe an interaction that took place during cross-examination of D.L. During an exchange about the marks appearing on D.L.'s body, defense counsel asked D.L "[i]f there are two prongs on the taser you should have more than forty-eight marks on your body. Does that sound right?" to which the prosecution objected and asked whether the question "is [counsel's] expert opinion." In response to the objection, the court stated that the question was "too specific."

importance of the erroneously admitted evidence to the prosecution's case, and the cumulative nature of the error. *Id.*

{25} Defendant was charged and convicted of twenty-four counts of child abuse. Detective Smith testified that he observed twenty-four pairs of stun gun injuries on D.L.'s body. This evidence was the most authoritative causal connection between Defendant and the injuries observed on D.L.'s body. No other witness, including D.L. himself, testified to that exact number of marks being caused by a stun gun.[6] The primary witnesses against Defendant were young children when the assaults occurred. Their testimony contained numerous inconsistencies and was subject to change under cross-examination. These inconsistencies dramatically increased the importance of Detective Smith's testimony to the State's case. *See id.* Under the circumstances, a reasonable probability exists that Detective Smith's testimony impacted the jury's verdict by authoritatively declaring that (1) the cause of D.L.'s injuries was a stun gun, and (2) the number of assaults was at least twenty-four. As such, the admission of Detective Smith's testimony did not constitute harmless error and requires reversal of Defendant's convictions on all counts.

---

[6] D.L. testified on direct examination that most of the marks present on his body during the police interview were the result of mosquito bites.

18

**SUFFICIENCY OF THE EVIDENCE**

{26} Defendant argues that there was not sufficient evidence to support his convictions on twenty-four counts of child abuse by torture. We address this issue independently from our analysis of the evidentiary issue to avoid double jeopardy implications on retrial. *See State v. Mascareñas*, 2000-NMSC-017, ¶ 31, 129 N.M. 230, 4 P.3d 1221 ("By addressing [the defendant's] claim of insufficient evidence and determining that retrial is permissible, we ensure that no double jeopardy concerns are implicated.").

{27} Sufficient evidence exists to support a conviction when "substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. It is the exclusive province of the jury to resolve inconsistencies or ambiguities in a witness's testimony, *State v. Sena*, 2008-NMSC-053, ¶ 11, 144 N.M. 821, 192 P.3d 1198, and "New Mexico appellate courts will not invade the jury's province as fact-finder by

second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (alterations, internal quotation marks, and citation omitted). Instead, we determine only whether "a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Duran*, 2006-NMSC-035, ¶ 5 (internal quotation marks and citation omitted). We measure the sufficiency of the evidence against the instructions given to the jury. *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883.

{28} Defendant argues at length that the State failed to present sufficient evidence to prove beyond a reasonable doubt that (1) Defendant directly assaulted D.L. twenty-four times, or (2) Defendant was culpable under the language of our accessory statute. We address these arguments in turn.

**Sufficiency of the Evidence to Convict Defendant as D.L.'s Principal Abuser**

{29} Child abuse occurs when "a person knowingly, intentionally or negligently, and without justifiable cause, caus[es] or permit[s] a child to be: (1) placed in a situation that may endanger the child's life or health; (2) tortured, cruelly confined or cruelly punished; or (3) exposed to the inclemency of the weather." Section 30-6-1(D). The twenty-four count indictment against Defendant was consistent with the statutory language.

20

{30}   At trial, the district court gave a jury instruction requiring that, to convict Defendant of child abuse by torture, the jury must find that Defendant (1) caused D.L. to be tortured; (2) intentionally and without justification; (3) while D.L. was under the age of eighteen; and (4) in the state of New Mexico between August 1, 2010 and October 29, 2010. This instruction is consistent with the uniform jury instruction on child abuse. *See* UJI 14-604 NMRA (1999) (withdrawn 2015). The language of the jury instruction, which only included the word "caused," implies that the Defendant must be found to be the principal abuser to support a conviction under this instruction. To affirm Defendant's convictions as D.L.'s principal abuser, this Court must conclude that any rational jury, based upon the evidence presented, could have found Defendant guilty beyond a reasonable doubt. *Duran*, 2006-NMSC-035, ¶ 5.

{31}   D.L. testified that Defendant stunned him more than twenty-four times. While D.L.'s testimony was not unequivocal on this topic, it was presented to the jury for consideration. The jury also saw pictures of D.L.'s injuries and heard corroborating testimony from L.L. and Detective Smith. On this evidence, a rational jury could have found Defendant guilty beyond a reasonable doubt as D.L.'s principal abuser on twenty-four counts of child abuse by torture.

21

**Sufficiency of the Evidence to Convict Defendant as an Accessory to Abuse Committed by Another**

{32}    Additionally, the district court gave a jury instruction requiring that, to convict Defendant as an accessory to child abuse by torture, the jury must find (1) Defendant intended that the crime be committed; (2) the crime was committed; and (3) Defendant helped, encouraged, or caused the crime to be committed. This instruction is consistent with the uniform jury instruction on accessory liability. *See* UJI 14-2822 NMRA.

{33}    Our accessory liability statute provides, in pertinent part, that "[a] person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he did not directly commit the crime." NMSA 1978, § 30-1-13 (1972). Being an accessory is not a distinct offense, but it is instead linked to the actions of the principal. *State v. Carrasco*, 1997-NMSC-047, ¶ 6, 124 N.M. 64, 946 P.2d 1075. A person charged as an accessory is equally as culpable as the primary offender and is subject to the same punishment. *Id.* An accessory must share the criminal intent of the principal, and this intent may be inferred "from behavior which encourages the act or which informs the confederates that the person approves of the crime after the crime has been committed." *Id.* ¶ 7. Generally, mere presence during the commission of the charged offense, even presence accompanied by mental approbation, is insufficient to infer the criminal intent required by the

22

statute. *Luna*, 1979-NMCA-048, ¶ 11. However, this generality does not apply in the same manner to those "entrusted with the care and safekeeping of a child[.]" *State v. Orosco*, 1991-NMCA-084, ¶ 25, 113 N.M. 789, 833 P.2d 1155, *aff'd*, 1992-NMSC-006, 113 N.M. 780, 833 P.2d 1146.

{34}    In *Orosco*, the defendant lived with his girlfriend and her six-year-old son, the victim. *Id.* ¶ 2. While providing child care, the defendant and a friend took the victim to a bar where the friend sexually assaulted the victim. *Id.* After the assault, the victim consistently stated that he was forced to perform sexual acts on the friend, but he gave inconsistent statements about the defendant's role in the assault. *Id.* In one statement, the victim alleged that the friend assaulted him in the bar bathroom and that the defendant laughed at him when the assault was over. *Id.* ¶ 4. In later statements, the victim alleged that both the defendant and the friend were in the bathroom and that the defendant held his head while the friend attempted to have oral sex with him. *Id.* ¶¶ 5-6. The defendant was charged with criminal sexual contact with a minor as an accessory. *See id.* ¶ 1. At trial, both the state and the defendant took the position that, in order to convict, the jury must find that the defendant took an active role in the assault. *See id.* ¶ 22 ("Thus, both the state and [the] defendant seem to concede that [the] defendant's mere presence during the molestations would not suffice to convict him as an accessory, even though [the] defendant had charge of the care of the minor

23

and took no steps to protect him."). While expressly upholding the defendant's convictions based upon testimony indicating approval or encouragement in the assault, this Court, sua sponte, held that a parent, or a person "charged with the care and welfare of [a] child," is culpable as an accessory for the failure, when present, to take reasonable steps to protect a child from an assault by another. *Id.* ¶¶ 20, 26-27.

{35} Based on *Orosco*, as D.L.'s foster parent, Defendant had an affirmative duty to protect D.L. from assaults occurring during Defendant's presence. He thus was subject to conviction under our accessory liability statute on this basis.

{36} At trial, D.L. testified that (1) Defendant purchased the stun gun and gave it to his son Mikey; (2) he was stunned by Mikey approximately fifteen times; (3) he was stunned by Brandon approximately three times; and (4) Defendant was present during assaults by Mikey and Defendant would laugh in response. L.L. testified that she saw D.L. get stunned by various individuals between ten and fifteen times. On this evidence, a rational jury could have found Defendant guilty beyond a reasonable doubt as an accessory to child abuse inflicted by another, even though the maximum number of convictions supported by the evidence is eighteen.

{37} When, as in this case, a district court uses general rather than specific verdict forms, the appellate courts are often unable to determine the jury's rationale for conviction. In this case, the jury might have found that Defendant was guilty of all

24

twenty-four counts of child abuse as the principal abuser. The jury also might have found that Defendant was guilty in part as the principal abuser and in part as an accessory. Regardless of the basis for the jury's conclusion, the evidence was sufficient because the convictions can be sustained under just one of the theories—that is, that Defendant was guilty beyond a reasonable doubt as the principal abuser on all twenty-four counts.

**DUE PROCESS AND DOUBLE JEOPARDY**

{38}     Defendant's final argument relates to the charging scheme employed by the State at trial. Defendant argues that the State's indictment violated his right to due process inasmuch as he was denied notice of the particular charges against him and potentially subjected him to double jeopardy under a course of conduct theory of prosecution. "We review questions of constitutional law and constitutional rights, such as due process protections, de novo." *N.M. Bd. of Veterinary Med. v. Riegger*, 2007-NMSC-044, ¶ 27, 142 N.M. 248, 164 P.3d 947.

{39}     The United States Constitution provides procedural due process protections to criminal defendants, including the right to have "reasonable notice of charges against [them] and a fair opportunity to defend[.]" *State v. Baldonado*, 1998-NMCA-040, ¶ 21, 124 N.M. 745, 995 P.2d 214. "Procedural due process also requires that criminal charges provide criminal defendants with the ability to protect themselves from

25

double jeopardy." *State v. Dominguez*, 2008-NMCA-029, ¶ 5, 143 N.M. 549, 178 P.3d 834 (internal quotation marks and citation omitted). The right to these protections is regularly asserted in cases in which, as here, the allegations of child victims lack specificity as to the date, location, or details of an incident. *See generally id.*; *Baldonado*, 1998-NMCA-040; *State v. Tafoya*, 2010-NMCA-010, 147 N.M. 602, 227 P.3d 92.

{40} The rights of defendants are balanced against the state's compelling interest in protecting child victims of abuse and prosecuting perpetrators of violence against children. *See Baldonado*, 1998-NMCA-040, ¶ 20 ("[T]here exists a profound tension between the defendant's constitutional rights to notice of the charges against him and to present a defense, and the state's interest in protecting those victims who need the most protection." (internal quotation marks and citation omitted)). Given this compelling interest, our courts recognize the limitations of child victims and are "less vigorous in requiring specificity as to time and place when young children are involved than would usually be the case where an adult is involved." *Id.* ¶ 21 (internal quotation marks and citation omitted).

{41} Application of our relevant case law to the facts of this case demonstrates that Defendant's argument must prevail. Defendant was charged with twenty-four counts of child abuse by torture; a number that appears to be derived by combining Detective

Smith's claim that twenty-four matched injuries were located on D.L.'s body, and D.L.'s testimony that he stopped counting how many times he was stunned at twenty-four. The criminal indictment does not differentiate between any of the incidents, but instead it presents twenty-four identical counts. Each count states:

> Child Abuse, in that on or between June 01, 2010, and October 29, 2010, in Curry County, New Mexico, the above-named defendant did intentionally and without justification, cause or permit D.L., a child under the age of eighteen years, to be placed in a situation that may endanger his life or health, OR tortured, cruelly confined or cruelly punished D.L., contrary to NMSA 1978, Section 30-6-1(D), a third degree felony.

The charging period was later amended to August 1, 2010 to October 29, 2010.

{42} As a threshold matter, this case does not present a question of the permissibility of the charging period. It is undisputed that any stunning that did occur happened between the date the stun gun arrived in the mail, sometime in early August 2010, and October 29, 2010, when D.L. and L.L. were removed from the house. As a result, this case does not require application of the *Baldonado* test for permissibility of the charging period. *See id.* ¶ 27 (outlining test for a permissible charging period when the allegations of a child victim lack specificity with respect to timing of the assault(s)). While this Court recognizes the merits of the public policy rationale outlined in *Baldonado*, a determination as to the presence of a due process violation

27

in the present case does not turn on questions related to "whether an indictment is reasonably particular with respect to the time of the offense." *Id.* ¶ 26.

{43} Instead, our inquiry relates to the lack of specificity of the incidents alleged against Defendant, making *Dominguez* the controlling precedent. 2008-NMCA-029. In *Dominguez*, the defendant was charged with ten counts of criminal sexual contact of a minor under the age of thirteen over a period of approximately ten weeks. *Id.* ¶ 2. All ten counts of the indictment were identical and "[n]othing in the indictment provided any information that would distinguish one count from any other count." *Id.* After the state filed a bill of particulars, the district court concluded that "the [s]tate had provided [the d]efendant with notice of the facts and circumstances as to five alleged incidents," and it dismissed the five remaining undifferentiated counts. *Id.* ¶ 4. On appeal, this Court reviewed the dismissal of the five undifferentiated counts and held that the dismissal was appropriate for the "five counts that could not be linked to a particular incident of abuse." *Id.* ¶ 10. We noted:

> [a]lthough we have allowed some leeway in the charging period where child victims are unable to recall dates with specificity, we have never held that the [s]tate may move forward with a prosecution of supposedly distinct offenses based on no distinguishing facts or circumstances at all, simply because the victim is a child.

*Id.* Additionally, we stated that our holding was necessitated by the "very real possibility that the defendant would be subject to double jeopardy in his initial trial

by being punished multiple times for what may have been the same offense." *Id.* ¶ 9 (alterations, internal quotation marks, and citation omitted).

{44} We followed the *Dominguez* rationale in *Tafoya*, 2010-NMCA-010, ¶¶ 22, 24. In *Tafoya*, the defendant was charged with four counts of criminal sexual penetration of a minor under the age of thirteen, among other charges. *Id.* ¶ 1. Two of the counts were for vaginal penetration and two of the counts were for anal penetration. *Id.* ¶ 2. The defendant was convicted of the four charges. *Id.* ¶ 6. On appeal, the defendant argued that a lack of factual specificity in the indictment and the evidence at trial required reversal. *Id.* ¶ 20. Relying on *Dominguez*, we held that a lack of differentiation with respect to the counts of vaginal and anal penetration necessitated reversal of one count of each. *Tafoya*, 2010-NMCA-010, ¶¶ 22, 24.

{45} The State charged Defendant with twenty-four individual counts of child abuse based upon D.L.'s allegations that Defendant and his sons assaulted him with a stun gun numerous times between August and October 2010. The indictment did not provide notice as to any specific instance in which Defendant was alleged to be the principal abuser. Nor did it provide notice as to any specific instance in which Defendant was alleged to be an accomplice to abuse inflicted by others. We view this case as directly analogous to *Dominguez*, in that the indictment and trial placed Defendant in a situation in which it was "impossible for the jury to conclude that [he]

29

was guilty of some of the offenses, but not others" and "[t]he jury could have found him not guilty of some of the counts only if they reached the conclusion that the child victim had overestimated the number of abusive acts." 2008-NMCA-029, ¶ 8 (internal quotation marks and citation omitted).

{46} Because Defendant's due process rights were violated by the district court proceedings, and retrial is not barred, we must craft an appropriate remedy. *State v. Slade*, 2014-NMCA-088, ¶ 40, 331 P.3d 930 ("Where a defendant successfully challenges his or her conviction on some basis other than insufficiency of the evidence, double jeopardy does not apply." (internal quotation marks and citation omitted)).

{47} In similar circumstances, our double jeopardy jurisprudence allows for the state to proceed with a single count of child abuse by torture under a course of conduct theory. *See Dominguez*, 2008-NMCA-029, ¶ 10 ("[I]f the [s]tate can only support its indictment with a child's statements regarding a defendant's course of conduct and does not have enough specific information to charge distinct incidents of abuse, the [s]tate is still able to go forward with the prosecution since this Court has held that evidence of a course of conduct will support a single count of abuse."); *State v. Altgilbers*, 1989-NMCA-106, ¶¶ 38-39, 109 N.M. 453, 786 P.2d 680 (explaining that the state may charge a single count for multiple acts under a course of conduct

theory). That said, the State is not required to employ a course of conduct theory on retrial. If the State elects to retry Defendant on multiple counts of child abuse by torture, it shall file a bill of particulars supporting its indictment. The district court may then conduct a hearing to determine whether each count charged meets the due process requirements under *Dominguez*. If the result of that hearing is a ruling that certain counts must be dismissed, Defendant's new trial shall be on the remaining counts only.

**CONCLUSION**

{48} For the foregoing reasons, we reverse Defendant's convictions on all counts and remand to the district court for retrial consistent with procedures outlined in this opinion.

{49} **IT IS SO ORDERED.**


_____
**JAMES J. WECHSLER, Judge**


**WE CONCUR:**


_____
**MICHAEL E. VIGIL, Chief Judge**


_____
**MICHAEL D. BUSTAMANTE, Judge**

31