2020 IL App (2d) 180872-U
No. 2-18-0872
Order filed December 22, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No.   16-CF-575 |
| JOEL CAMACHO, | ) ) | Honorable James C. Hallock, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) Defendant was not denied the effective assistance of counsel where, although defense counsel "opened the door" to State's inquiry of other crimes, such evidence was independently admissible under section 115-7.4 of the Code of Criminal Procedure of 1963 and the jury acquitted defendant of three of the four counts that went to trial; and (2) the trial court erred in allowing the State to elicit testimony from police officer regarding the nature of defendant's injuries without first qualifying the officer as an expert, but error was harmless.

¶ 2   Following a jury trial in the circuit court of Kane County, defendant, Joel Camacho, was convicted of one count of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2016)). The trial court sentenced defendant to 24 months' probation. Defendant appeals, raising two issues. First,

defendant argues that he was denied the effective assistance of counsel where defense counsel "opened the door" to the introduction of other-crimes evidence. Second, defendant argues that the trial court improperly allowed the State to elicit opinion evidence from a police officer regarding the nature of injuries defendant received during the offense of which he was convicted. For the reasons set forth below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Indictment

¶ 5     On June 22, 2016, defendant was charged by indictment with two counts of aggravated domestic battery (counts I and II) and four counts of domestic battery (counts III through VI). The State nolle prossed counts V and VI prior to defendant's trial. Of the remaining charges, count I alleged that defendant committed the offense of aggravated domestic battery in that defendant, while committing a domestic battery, knowingly caused bodily harm to Blanca Martinez, a family or household member of defendant, in that defendant strangled Martinez. 720 ILCS 5/12-3.3(a-5) (West 2016). Count II alleged that defendant committed the offense of aggravated domestic battery in that defendant, while committing a domestic battery, knowingly made physical contact of an insulting or provoking nature to Martinez, a family or household member, in that defendant strangled Martinez. 720 ILCS 5/12-3.3(a-5) (West 2016). Count III alleged that defendant committed the offense of domestic battery in that he knowingly caused bodily harm to Martinez, a family or household member, in that he struck, pushed, hit, and/or grabbed Martinez about the head and/or body, after having previously been convicted of domestic battery in two Kane County cases. 720 ILCS 5/12-3.2(a)(1) (West 2016). Count IV alleged that defendant committed the offense of domestic battery in that he knowingly made physical contact of an insulting or provoking nature with Martinez, a family or household member, in that he struck, pushed, hit,

and/or grabbed Martinez about the head and/or body, after having previously been convicted of domestic battery in two other Kane County cases. 720 ILCS 5/12-3.2(a)(2) (West 2016).

¶ 6                                    B. Pre-Trial Proceedings

¶ 7     Prior to trial, the State filed a motion pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2016)) seeking to admit evidence of three other domestic-violence incidents. The first incident occurred on June 21, 2010, and involved Tracy Kielich, one of defendant's ex-girlfriends. During the incident, defendant allegedly grabbed and pushed Kielich and "pressed his hands on her neck and chest area." The second incident occurred on September 18, 2012, and involved Alicia Ramirez, another ex-girlfriend of defendant. During the incident, defendant allegedly grabbed Ramirez's hair and arm and squeezed her face with his hands. The third incident occurred on July 28, 2016, and involved Paula Camacho, defendant's mother. During the incident, defendant allegedly grabbed and pushed his mother. Defendant was allegedly intoxicated from consuming alcohol during all three incidents. Defendant pleaded guilty to the first two incidents. The third incident was the subject of a trial, following which the jury found defendant not guilty. The State argued that the prior domestic-violence incidents should be admitted "due to the close proximity in time and [their] factual similarity." The State indicated that it intended to use this information to show propensity, means, motive, opportunity, knowledge, and *modus operandi*. At the hearing on the State's motion, the State withdrew its request to admit the 2010 and 2012 convictions. Over defendant's objection, the court granted the State's motion to admit evidence of the 2016 incident involving defendant and his mother.

¶ 8                                    C. Trial

¶ 9    The matter proceeded to trial on August 13, 2018. The State's first witness was Martinez. Martinez testified that she and defendant had been dating for four years and that defendant had lived with her "back and forth." According to Martinez, at around 6 p.m. on April 5, 2016, she went to defendant's workplace, an autobody shop, to drop off some food. When Martinez arrived, she saw defendant hug and kiss another female. This made Martinez "very angry" and "sad."

¶ 10    Martinez waited until the female left before approaching defendant. Martinez told defendant that she "knew what he was doing," and a verbal argument ensued. Martinez testified that defendant did not "do anything to her physically" until she reached out to grab his phone. Martinez reached for the phone "a bunch of times." At one point, defendant touched her neck and chest area. Martinez could not breathe because of the anxiety and emotions. Defendant pushed Martinez's arm away, she hit herself in the chest, and "somehow his knee hit" her. Martinez fell to the floor but she got up and "continued" because she was "very upset" and "had a lot of emotions." Defendant did not physically touch Martinez when she was on the ground.

¶ 11    At some point, Martinez went to her car. Defendant then entered a beige vehicle, exited the vehicle, and entered Martinez's car holding what "seemed like a gun" or "a bee-bee gun." Defendant appeared upset, put the gun to his head, and said, "What if I was to disappear?" Martinez told defendant to put the gun down and not to do "anything stupid" because he had children. Defendant exited the vehicle. Martinez went home when the owner of the business came in. Martinez did not call the police that day because she knew that defendant was "just upset" and would not "do it again." Martinez believed that defendant was under the influence of alcohol at the time of the altercation. In addition, she acknowledged that she scratched defendant's face during the argument.

¶ 12    Martinez testified that defendant sent her text messages later that night and asked her to give him a ride to work the next day. Martinez agreed to do so because she had been with defendant for four years and loved him. On April 6, Martinez and defendant started arguing while Martinez drove defendant to work. Defendant wanted Martinez to give him a ride home that evening but Martinez declined because she believed defendant had been drinking alcohol again. Martinez initially testified that defendant did not do anything to her physically. Martinez later stated that defendant probably pushed her and touched her face during the April 6 argument because they were "fighting," and she pushed him out of her vehicle.

¶ 13    Martinez then drove home and, after speaking with defendant's boss on the phone, called the police. The police arrived while she was on the phone because defendant had already contacted them. The police took photographs of Martinez, and she provided a written statement. Martinez testified that she was still "very emotional" at the time. On April 7, Martinez went to the Aurora police station to have additional photographs taken. Martinez did not recall providing a second written statement that day. She later acknowledged that she had provided a second written statement to the police. Martinez was still upset with defendant on April 7. Martinez also filed a petition for an order of protection on April 7, but only because she "was scared and everybody was telling [her] go do it." Martinez testified that she "came right back to take [the order of protection] off."

¶ 14    Martinez's written statements and the order of protection were admitted into evidence. Martinez's April 6 written statement indicated that, on April 5, defendant pushed her on the floor, grabbed her neck, and tried to choke her. Her statement also indicated that defendant showed her a gun and said he would kill her. In response to the contents of the April 6 written statement, Martinez testified that defendant did not try to choke her and only pushed her to get her away from

him when she tried to grab his phone. When Martinez tried to grab defendant's phone a second time, she hit herself with his knee. She also denied that defendant threatened her with a gun and reiterated that defendant only held the gun to his own head. Martinez was upset with defendant when she wrote this statement because she had seen him with another woman and because defendant had called the police and wanted her arrested for domestic battery.

¶ 15    Martinez's April 7 written statement indicated that defendant grabbed Martinez, threw her to the ground, put his knee on her chest and tried to choke her. According to the statement, defendant told Martinez, "See you can't with me I will kick your ass [*sic*]." In response to the contents of the April 7 written statement, Martinez acknowledged that defendant "did mention that he would kick [her] ass." However, she could not recall defendant being "on top of [her] or anything."

¶ 16    The petition for an order of protection indicated that defendant pushed Martinez to the ground, put his knee against her chest, and strangled her throat with his hand. The petition also indicated that defendant asked Martinez, "See? You think I can't kill you?" In response to the contents of the petition, Martinez acknowledged that she signed the petition and testified, "If that's what it says, that's what it says." Martinez denied that defendant said anything to her "at that moment" but added that she and defendant were "just yelling at each other."

¶ 17    Eleazar Garcia, the owner of the autobody shop where defendant worked, testified that he saw defendant and Martinez talking on April 6 at approximately 6 p.m. and they seemed "a little bit upset." Garcia noticed that Martinez's upper right pants leg was dusty. Garcia never saw defendant with a gun.

¶ 18    Officer Bradley VonHoff testified that he has been with the Aurora Police Department for 13 years and has received "particularized training" in domestic-battery training at the police

academy, as part of continuing education, and in-house. On April 6, 2016, at around 3:30 p.m., VonHoff responded to a 911 call reporting a domestic battery. When VonHoff arrived at the location, he met with defendant who was identified as the caller. VonHoff testified that defendant appeared "[a]gitated, upset" and had scratches on his face. Another officer took photographs of defendant's injuries, and defendant provided a written statement. After speaking with defendant, the officers proceeded to Martinez's home. Martinez answered the door crying. VonHoff noted that Martinez's neck was red and she had bruising on her arms. Martinez told VonHoff that she also had bruising on her chest and that her neck hurt. The other officer took photographs of Martinez, and Martinez provided a written statement. Martinez did not request medical treatment. After speaking with Martinez, the officers returned to defendant's workplace and arrested him for domestic battery. The officers searched the autobody shop for a gun but did not find one.

¶ 19    Officer Patrick Vega of the Aurora Police Department testified that Martinez approached him at the front desk of the Aurora police station on April 7 at around 9:40 a.m. Vega noticed that Martinez had "some redness to her face" and bruises on her stomach and neck. Martinez seemed calm and scared. Vega took photographs of Martinez, and Martinez gave Vega a written statement that had been prepared prior to her arrival at the station.

¶ 20    Following Vega's testimony, the State rested. Defendant then moved for a directed finding, which the trial court denied after argument.

¶ 21    Defendant testified on his own behalf. Defendant stated that as of April 2016, he had been dating Martinez "[o]ff-and-on" for about four years and that he had lived with Martinez at one time. Defendant further testified that on April 5, 2016, between 5 and 6 p.m., he was at work preparing an estimate for Luz Gutierrez, his niece's mother-in-law. Defendant said goodbye to Gutierrez by kissing her cheeks and hugging her, which was their custom. After Gutierrez left,

Martinez "rapidly" approached defendant. Defendant testified that Martinez appeared "pissed off" and "upset." Martinez asked defendant "who that bitch was that [he was] hugging and kissing?" As defendant walked into his place of employment, Martinez pushed him from behind and hit him in the back. Defendant ignored Martinez, but she grabbed a molding clip remover from defendant's tool area and tried to stab defendant in the face. Defendant put up his hands and Martinez stabbed one of his hands. Defendant grabbed the tool and threw it before he and defendant fell down. Martinez scratched defendant's face while they were on the ground. Defendant was able to get away from Martinez when his shirt ripped. Defendant tried to calm Martinez by telling her that he would explain who the woman was. Defendant denied initiating any contact with Martinez, choking her, or pushing her down and kneeling on her chest. Defendant stated that any contact he made with Martinez was done to stop her from attacking him.

¶ 22    Defendant and Martinez discussed the situation later that night when defendant spent the night with her. The following day, April 6, 2016, Martinez drove defendant to work. During the ride, defendant and Martinez got into another argument. Defendant was worried that the arguments with Martinez would cost him his job. After Martinez dropped off defendant, she "sped off." Defendant called the police because "the conversation started to escalate," he was "tired of it," and he decided "to put it to an end." When the police arrived, they took photographs of defendant. The photographs showed scratches on defendant's face and left wrist. Defendant testified that he did not have a gun at any time on April 5 or April 6 when he was with Martinez. Defendant gave consent to the police to search a vehicle he had been working on for a gun. Defendant lost his job after the police arrived.

¶ 23    On cross-examination, defendant was questioned by the State about what he told Officer VonHoff and what he included in his written statement. Defendant could not recall if he told

VonHoff the name of the female customer who he hugged and kissed but acknowledged that he did not include her name in his written statement. Defendant could not recall if he told VonHoff that Martinez pushed him as he walked into his place of employment or if he included that information in his written statement. Defendant testified that he included in his written statement that Martinez hit him for no apparent reason. Defendant did not include in his written statement that Martinez tried to hit him with one of his tools but he "might have mentioned it" to the officers on the scene. He was not sure if he included in his written statement that he and Martinez fell to the ground. Defendant did not tell the police that his shirt had been ripped during the April 5 altercation.

¶ 24    During redirect examination, defendant testified that he told the police that Martinez scratched his face and arms unprovoked and included in his written statement that Martinez had attacked him "for no apparent reason."

¶ 25    Defense counsel asked the court to play defendant's call to the police for the jury. The State objected on the basis that the call constituted hearsay. Defense counsel responded:

> "Judge, the State has impeached my client alleging that he failed to state anything about a tool, a molding clip remover. A prior consistent statement is absolutely admissible when confronted with a prior inconsistent statement to show that, no, he has, in fact, been consistent. It's on the 911 call. We laid a proper foundation, it should be admitted."

The trial court overruled the State's objection and the entirety of the call was played for the jury. During the call, defendant is heard telling the dispatcher that Martinez scratched his face the previous day at his workplace and that he did not call the police at that time because he had "priors," did not want to get arrested, and thought the police would "believe her." Defendant later reiterates that he had "priors" during the call. Defendant said that his face was "all

scratched up" and that he was "just trying to hold [Martinez] down yesterday." The dispatcher asked defendant if there were "any weapons" and defendant replied, "No, she tried grabbing my tools to hit [him] with it [*sic*]." Defendant testified that he was referring to the molding clip remover when he told the dispatcher that Martinez grabbed a tool with which to hit him.

¶ 26   On recross-examination, the State requested a sidebar during which it asked the court to allow it to question defendant about the "priors" he mentioned on the 911 call. Defense counsel objected to the State's request. The State replied that defense counsel "admitted it into evidence" and it should therefore be allowed to question defendant about the "priors." The court granted the State's request, noting that the State was "entitled to cross-examine on the evidence." The State asked defendant what he meant when he told the dispatcher that he had "priors" and that the police would "believe her." The following exchange then ensued between the State and defendant:

"A. [Defendant] What I meant by that is that, they're going to probably believe her what she says over mine because I have an old incident that occurred in 2012.

Q. [State] When you say, old incident, what does that mean?

A. An altercation between me and an ex-girlfriend.

Q. But you said priors, so you meant more than one, correct?

A. Yes.

Q. Okay. So there is more than just the one in 2012?

A. Yes.

Q. What else?

A. I believe it's an ex-girlfriend of mine.

Q. A different one than the one from 2012?

A. Yes.

Q. And when did that happen?

A. 2012 and 2010 I believe.

Q. Was there any other priors that you were referring to in the 911 tape?

A. No, ma'am."

Following defendant's testimony, the defense rested.

¶ 27    The State called Martinez as a rebuttal witness. Martinez testified that she scratched defendant's face on April 5, but she could not recall whether she grabbed a tool and hit or swung it at defendant. Martinez testified that on April 6, while driving defendant to work, she and defendant "touch[ed] each other" and that defendant "probably" touched her face "but not like to hit [her]." Martinez acknowledged that her written statement from April 7 indicated that she reached to get one of defendant's tools but she could not grab it because defendant was "too fast," Martinez tried hitting defendant to get him to let go of her, and Martinez only scratched defendant's face "when he saw that [she] was getting red."

¶ 28    The State also called Officer VonHoff in rebuttal. VonHoff testified that defendant never told him that Martinez kept pushing him and hitting him in the back, reached for a tool, or stabbed him in the hand. Moreover, VonHoff did not observe a tear in defendant's shirt and defendant did not mention that his shirt has been ripped. Defendant did not tell VonHoff the name of the female customer whom he hugged and kissed but said that it was a family member.

¶ 29    On cross-examination, VonHoff testified that defendant did tell him that Martinez screamed and started hitting him and that she scratched his face and arms unprovoked. Defendant told VonHoff that he held up his hands to hold Martinez away from him. In defendant's written statement, defendant indicated that Martinez "start[ed] to attack him."

¶ 30    On redirect examination, VonHoff testified that he viewed the scratches and marks on defendant's body and had seen "many types of wounds and injuries before." The State asked VonHoff if he could characterize the nature of defendant's injuries. Defense counsel objected on foundational grounds and on the basis that VonHoff's testimony about the nature of the injuries would be speculative. The court overruled defense counsel's objections. VonHoff then testified that defendant's injuries were "defensive wounds from somebody else defending themselves." Following VonHoff's testimony, the State rested.

¶ 31    In its closing arguments, the State mentioned that defendant told the police dispatcher that he did not call the police sooner because he had "priors." The State also mentioned Officer VonHoff's description of defendant's injuries as "a defensive wound, from someone trying to defend themselves." Defense counsel argued that this case presented a credibility contest between Martinez's and defendant's version of the events and the identity of the aggressor. During deliberations, the jury sent a note to the court asking, "Can we hear 911 tape again?" and "Can we have [defendant's] written statement?" After consulting with the parties, the court sent the jury the 911 recording but otherwise told the jury that it had "all of the evidence" and to keep deliberating. Subsequently, the jury returned a verdict of guilty on one count of domestic battery, making physical contact of an insulting or provoking nature (count IV) (720 ILCS 5/12-3.2(a)(2) (West 2016)). The jury found defendant not guilty of the remaining three counts.

¶ 32    Defense counsel filed a motion for a new trial, arguing that the court erred by: (1) allowing VonHoff to characterize defendant's injuries as defensive wounds caused by another individual defending herself and (2) allowing the State to cross-examine defendant about his prior criminal history. The court denied defendant's motion for a new trial, finding that the evidence of defendant's "priors" did not affect the jury where it found defendant not guilty of three of the four

counts that went to trial. The court also noted that it was the defense who initially introduced evidence of defendant's prior through admission of the call to the police. The court agreed with the State that it was proper to question VonHoff about defendant's wounds during rebuttal because defendant testified about the origin of his wounds during his testimony.

¶ 33    During sentencing, the State introduced certified copies of convictions defendant received in 2010, 2012, and 2016. The exhibits were admitted without objection.[1] Ultimately, the trial court sentenced defendant to 24 months' probation, which would run consecutive to his prison sentence in a 2016 DUI case because he committed the domestic battery while on bail in the DUI case. Defendant filed a timely notice of appeal.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, defendant raises two issues. First, he argues that he received ineffective assistance of counsel because his attorney "opened the door" to the State questioning him about his prior convictions when he requested that the 911 call to police be played in its entirety for the jury. Second, defendant argues that the trial court erred in allowing Officer VonHoff to testify about the nature of his injuries. We address each contention in turn.

¶ 36                          A. Ineffective Assistance of Counsel

¶ 37    Defendant first argues that his attorney's decision to play for the jury the 911 audio recording in its entirety amounted to ineffective assistance of counsel. According to defendant, the

_____

[1] Copies of the certified copies of conviction were not made part of the record filed on appeal. However, the presentence investigation report included in the record shows that the 2010 and 2012 cases were domestic-battery convictions, both class A misdemeanors. The 2016 case was an aggravated driving-under-the-influence (DUI) conviction.

decision "opened the door" for the State to cross-examine him regarding two prior altercations involving two ex-girlfriends in a case in which he was being tried for a domestic battery involving another girlfriend. The State responds that defendant's argument is meritless because defense counsel sought to introduce the 911 audio recording for the sole purpose of rebutting an inference that defendant's testimony had been fabricated.

¶ 38     Claims of ineffective assistance of counsel are resolved under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To establish a claim of ineffective assistance of counsel, a defendant must prove that (1) counsel's representation was deficient, *i.e.*, fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced him. *Strickland*, 466 U.S. at 687; *People v. Smith*, 195 Ill. 2d 179, 187-88 (2000). To establish that counsel's performance fell below an objective standard of reasonableness, the defendant must overcome the strong presumption that, under the circumstances, the challenged action or inaction was the product of sound appellate strategy. *People v. Barrow*, 133 Ill. 2d 226, 247 (1989). Because effective assistance refers to competent and not perfect representation, mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent. *People v. Moore*, 2012 IL App (1st) 100857, ¶ 43. To satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate a reasonable probability that the outcome of the trial would have been different or that the result of the proceeding was unreliable or fundamentally unfair. *Strickland*, 466 U.S. at 687; *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *Moore*, 2012 IL App (1st) 100857, ¶ 44. Such a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Because a defendant's failure to satisfy either prong of the *Strickland* test will defeat a claim of ineffective assistance, a court is not required to address both prongs of the inquiry if the

defendant makes an insufficient showing as to one. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). Where, as here, the ineffective-assistance claim was not litigated below, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 39   The term "other-crimes evidence" refers to misconduct or criminal acts that occurred either before or after the alleged criminal conduct for which the defendant is on trial. *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 35. Other-crimes evidence is unquestionably prejudicial to a defendant. See *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (noting that other-crimes evidence is objectionable because "such evidence has 'too much' probative value," rendering a jury inclined to convict the defendant simply because it believes that he or she is a bad person deserving punishment); *People v. Fletcher*, 335 Ill. App. 3d 447, 449 (2002) ("[W]e have long feared that providing proof of an accused's penchant for criminal behavior would control the decision-making process, resulting in convictions based upon past guilt instead of current evidence."). Under certain circumstances, however, the probative value of other-crimes evidence is considered to outweigh its prejudicial effect, rendering it admissible. For example, under the common law, other-crimes evidence may be admissible for limited purposes, such as establishing motive, identity, presence, *modus operandi,* knowledge, intent, common design, or absence of mistake. *Donoho*, 204 Ill. 2d at 170. Regardless of probative value, however, under the common law, the introduction of other-crimes evidence is not permitted for the purpose of establishing a defendant's propensity to commit a crime. *Donoho*, 204 Ill. 2d at 170; *Moore*, 2012 IL App (1st) 100857, ¶ 57.

¶ 40   Notwithstanding the general prohibition on the admission of other-crimes evidence to show a defendant's propensity for criminal conduct, other-crimes evidence is admissible to prove propensity as provided in sections 115-7.3, 115-7.4 and 115-20 of the Code (725 ILCS 5/115-7.3, 115-7.4, 115-20 (West 2018)). See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Relevant here, section

115–7.4 of the Code permits evidence of a defendant's prior commission of an offense of domestic violence to be admitted for any purpose, including the defendant's propensity to commit domestic-violence offenses. 725 ILCS 5/115-7.4(a) (West 2018); *People v. Dabbs*, 239 Ill. 2d 277, 295 (2010); *Nixon*, 2016 IL App (2d) 130514, ¶ 38. Like the common law, however, section 115-7.4 permits other-crimes evidence only if: (1) it is relevant; and (2) its probative value is not outweighed by its prejudicial effect. 725 ILCS 5/115-7.4; *Nixon*, 2016 IL App (2d) 130514, ¶¶ 36-42. Section 115-7.4 further provides that, in weighing probative value against prejudicial effect, a court may consider: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.4(b) (West 2018).

¶ 41    Turning to this case, the record establishes that defense counsel sought to introduce the 911 audio recording for the purpose of rebutting an inference that defendant's testimony had been fabricated, *i.e.*, to show that defendant had previously reported that Martinez had tried to hit him with a tool. However, the recording also contained two statements from defendant that he had "priors." Defense counsel did not move to have defendant's statements about his "priors" redacted from the recording even though it is reasonably likely that such a request would have been granted. See *Moore*, 2012 IL App (1st) 100857, ¶ 48 (providing that "where evidence of unrelated offenses is contained in an otherwise competent statement of confession, it must be deleted before the statement or confession is read to the jury, unless to do so would seriously impair its evidentiary value"). Then, on recross-examination, the State seized upon defendant's statements that he had "priors" to question him about the nature of those other offenses. The State later referenced defendant's priors during its closing argument, and the jury requested the 911 audio recording during its deliberations.

¶ 42    Defendant contends that the other-crimes evidence introduced through the 911 recording was prejudicial and served to undermine defendant's credibility, which was critical to his defense in this case. According to defendant, trial counsel's decision to "open the door" to evidence of his 2010 and 2012 altercations with two ex-girlfriends "unnecessarily lead the jury to infer that Camacho was a bad person who had a propensity to commit domestic batteries and thus likely committed a battery against Martinez."

¶ 43    While we do not dispute that absent defense counsel's decision to play the 911 audio recording, the jury never would have learned of defendant's prior involvement in the prior domestic-violence incidents, defendant's argument assumes that evidence of the two prior altercations would not have been admissible. Defendant, however, does not explain why this evidence was not "otherwise admissible." True, the State voluntarily withdrew that portion of its pretrial motion seeking to admit evidence of the 2010 and 2012 domestic battery pursuant to section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2018)). But the reason for the State's decision is not clear from the record. Moreover, the trial court granted the State's motion with respect to a third incident of domestic violence involving defendant's mother, although the State did not present this evidence at trial. More significantly, the record establishes that had the State formally moved for admission of the other-crimes evidence at issue, there is a reasonable probability that the trial court would have granted the request.

¶ 44    As noted above, in weighing the probative value of evidence against undue prejudice to a defendant, section 115-7.4(b) of the Code instructs the court to consider (1) the proximity in time to the charged or predicate offense, (2) the degree of factual similarity to the charged or predicate offense, or (3) other relevant facts and circumstances. 725 ILCS 5/115-7.4(b) (West 2018). Regarding the first factor, we note that subsection 115-7.4(b)(1) does not provide a bright-line rule

about when prior convictions are *per se* too old to be admitted. See *Donoho*, 204 Ill. 2d at 183-84 (discussing identical language in section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 1998)). In this case, approximately six years elapsed between the 2010 incident and the instant offense involving Martinez. Approximately four years elapsed between the 2012 incident and the instant offense regarding Martinez. In *Donoho*, 204 Ill. 2d at 184, the supreme court noted that, while the passage of 12 to 15 years since the prior offense might have lessened its probative value, standing alone this gap was insufficient to compel a finding that such evidence was improperly admitted. Moreover, in both *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 37, and *People v. Davis*, 260 Ill. App. 3d 176, 192 (1994), the courts found proper the admission of evidence of crimes occurring 20 years prior to the offenses at issue. As noted, the number of years between the events in this case was much less than in *Donoho*, *Braddy*, or *Davis*. Accordingly, we find that evidence of the 2010 and 2012 domestic-battery incidents were close enough in time to the instant offense to be relevant and probative. See *Nixon*, 2016 IL App (2d) 130514, ¶ 42 (holding that offense occurring six years before offense at issue was relevant and probative). Second, a review of the factual summary of the 2010 and 2012 incidents in the State's pre-trial motion shows that there are factual similarities between those incidents and the instant offense to support the admission of the evidence of the prior acts. Significantly, in all three cases, defendant was involved in altercation with an ex-girlfriend, he was reportedly intoxicated from consuming alcohol at the time of the altercation, and defendant purportedly grabbed, pushed, or squeezed the victim. While there are some factual differences between the prior offenses and the current charges, most significantly the 2010 and 2012 incidents occurred when defendant went to the victims' homes uninvited, this does not defeat admissibility because no two independent crimes are identical. *Donoho*, 204 Ill. 2d at 185. Indeed, we note that the 2010 and 2012 incidents bore much more similarities with the instant

offense than the altercation involving defendant's mother, for which the trial court did grant the State permission to present.

¶ 45    We recognize that "[e]ven when relevant and probative, other-crimes evidence must not become a focal point of the trial." (Internal quotation marks omitted.) *People v. Arze*, 2016 IL App (1st) 131959, ¶ 98; see also *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006). Thus, in admitting evidence of other crimes to show propensity, a trial court should not permit a mini-trial of the other offenses, but should allow only that which is necessary to illuminate the issue for which the other crimes were introduced. *Arze*, 2016 IL App (1st) 131959, ¶ 98. Here, the prior other-crimes evidence was limited to the brief reference to the other-crimes evidence on the 911 audio recording, defendant's brief testimony on cross-examination, and the State's brief reference to them in closing argument. Thus, we find that there was no "mini trial" in this case.

¶ 46    In short, contrary to defendant's argument, the evidence of defendant's two "priors" for domestic battery was "otherwise admissible" under section 115-7.4 of the Code. Indeed, despite the admission of defendant's "priors," the jury acquitted defendant of three of the four counts that went to trial. Given this record, we find that defendant has failed to satisfy the prejudice prong of the *Strickland* test. That is, defendant has failed to demonstrate a reasonable probability that the outcome of the trial would have been different absent defense counsel's alleged error or that the result of the proceeding was unreliable or fundamentally unfair. *Strickland*, 466 U.S. at 687; *Evans*, 209 Ill. 2d at 220 (2004); *Moore*, 2012 IL App (1st) 100857, ¶ 44

¶ 47    Defendant nevertheless suggests that a contrary holding is compelled by *People v. Fletcher*, 335 Ill. App. 3d 447 (2002), and *People v. Valentine*, 299 Ill. App. 3d 1 (1998). We find both cases distinguishable.

¶ 48    In *Fletcher*, trial counsel elicited testimony from the defendant that he "had been in trouble with the law before" and had "a kind of extensive" criminal history dating to back when he was a juvenile. *Fletcher*, 335 Ill. App. 3d at 450. Defense counsel did so as part of a strategy to demonstrate that when the defendant had committed an offense, he pleaded guilty rather than going to trial. *Fletcher*, 335 Ill. App. 3d at 450. On cross-examination, the State brought out detailed evidence about defendant's prior criminal history, including convictions for theft, criminal trespass, and unlawful consumption. *Fletcher*, 335 Ill. App. 3d at 450-452. The jury convicted the defendant. On appeal, the reviewing court found that the defendant was prejudiced by trial counsel's actions. *Fletcher*, 335 Ill. App. 3d at 455-457. This case is readily distinguishable from *Fletcher*. In *Fletcher*, the State's cross-examination revealed that the defendant "had engaged in a continuous course of criminal behavior from the age of 14 up to the time that he was charged with [the] offense" at issue. *Fletcher*, 335 Ill. App. 3d at 455. Here, in contrast, only limited testimony was elicited regarding the nature of defendant's two prior altercations with his ex-girlfriends. No other evidence of a criminal history was introduced.

¶ 49    In *Valentine*, the defendant was charged with aggravated battery and unlawful restraint. Prior to trial, the State successfully moved to use the defendant's prior retail theft conviction for impeachment purposes if the defendant took the stand. The Defendant did testify. During direct examination, trial counsel questioned the defendant about the retail theft conviction and also asked if he was "arrested in '94 or '93 for anything involving violence" or "[a]nything involving possession of a weapon." *Valentine*, 299 Ill. App. 3d at 3. The defendant responded to both inquiries in the negative. *Valentine*, 299 Ill. App. 3d at 3. Following a sidebar, the court ruled that defense counsel had " 'open[ed] the door' for the State to correct the portrayal of [the] defendant 'in a nonviolent light' pursuant to 'the doctrine of completeness." *Valentine*, 299 Ill. App. at 3.

The State then cross-examined the defendant about his criminal record, including four arrests for battery, for impeachment purposes. *Valentine*, 299 Ill. App. 3d at 3. The appellate court majority determined that the defendant was denied the effective assistance of counsel when defense counsel "opened the door" to the State's use of the defendant's battery convictions to impeach him. *Valentine*, 299 Ill. App. 3d at 3-5.

¶ 50    Central to the *Valentine* court's decision was its finding that, pursuant to *People v. Montgomery*, 47 Ill. 2d 510 (1971), and *People v. Williams*, 161 Ill. 2d 1 (1994), "the State could not have independently used defendant's prior battery arrests to impeach [the] defendant." *Valentine*, 299 Ill. App. 3d at 4. The court stated that "[a] reasonably effective lawyer would have challenged the State's use of such evidence before calling [the] defendant to the witness stand," but defense counsel "not only failed to challenge the use of [the] defendant's prior battery arrests, counsel 'opened the door' to that line of questioning by eliciting testimony that gave a false impression of [the] defendant's criminal history." *Valentine*, 299 Ill. App. 3d at 4. As noted above, here the State could have used defendant's prior domestic-battery convictions for propensity purposes. Thus, *Valentine* is inapposite.

¶ 51                        B. VonHoff's Testimony

¶ 52    Defendant also complains that the trial court erred in allowing the State to elicit, over his objection, testimony from Officer VonHoff about the nature of his injuries. Specifically, defendant claims that VonHoff's testimony that the scratches and marks on defendant's body were "defensive wounds from somebody else defending themselves" was based on specialized knowledge. Defendant notes, however, that VonHoff was not qualified as an expert, so his testimony should have been limited to opinions or inferences which were "not based on scientific, technical, or specialized knowledge." Ill. R. Evid. 701 (eff. Jan. 1, 2011). Defendant argues that because

VonHoff's testimony constituted improper opinion testimony that went to the ultimate factual issues in this case, its admission constituted error. We review the trial court's evidentiary rulings for an abuse of discretion. *People v. Crump*, 319 Ill. App. 3d 538, 541 (2001). An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Gist*, 2013 IL App (2d) 111140, ¶ 11.

¶ 53     The courts in *People v. Loggins*, 2019 IL App (1st) 160482, and *Unites States v. Jones*, 739 F.3d 364, 369 (7th Cir. 2014), addressed issues similar to the one raised by defendant here. In *Loggins*, a police detective opined as to "the uses of plastic bags, blenders, and inositol in the drug trade." *Loggins*, 2019 IL App (1st) 160482, ¶¶ 11, 76, 92. The defendant did not object to the detective's testimony. *Loggins*, 2019 IL App (1st) 160482, ¶ 11. On appeal, the defendant asserted that the detective's testimony was inadmissible expert opinion testimony because it was based on his "training and expertise" as a drug investigator but the detective was never tendered by the State, or accepted by the trial court, as an expert in drug distribution. The reviewing court agreed with the defendant. *Loggins*, 2019 IL App (1st) 160482, ¶¶ 79-106. The court explained that to constitute a lay opinion, an officer's testimony "must be based on the officer's personal observations of the underlying events and they cannot require the officer to draw on any specialized knowledge or expertise." *Loggins*, 2019 IL App (1st) 160482, ¶ 88. Stated differently, the officer's opinions "must be opinions that anyone in the same position, not just a trained officer, would have been qualified to offer." *Loggins*, 2019 IL App (1st) 160482, ¶ 88. The court stated, however, that "when an officer testifies to opinions that are 'based upon the officer's experience over the years ***' [Citation], then the officer no longer serves as a fact witness offering lay testimony." *Loggins*, 2019 IL App (1st) 160482, ¶ 89. Thus, if the officer's opinion "rests ' "in

any way" ' on the officer's specialized knowledge, it is expert testimony." *Loggins*, 2019 IL App (1st) 160482, ¶ 89 (quoting *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (quoting 4 Weinstein's Federal Evidence § 701.03[1])).

¶ 54     As an example of the distinction between a lay opinion and an expert opinion, the *Loggins* court cited "the meaning of code words used in a drug transaction." *Loggins*, 2019 IL App (1st) 160482, ¶¶ 90-91. The court stated that an officer's testimony regarding the meaning of such code words constitutes lay opinion if it is "based *entirely* on the officer's firsthand interactions with the participants and observations of how *they* used the code words at issue when planning or executing drug transactions." (Emphasis in original.) *Loggins*, 2019 IL App (1st) 160482, ¶ 90. The court explained that in such circumstances, "the officer's opinion results not from a specialized skill, but simply from his or her ability to catch on to new or invented uses of language by observing them in context." *Loggins*, 2019 IL App (1st) 160482, ¶ 90. In contrast, an officer's testimony regarding the meaning of code words constitutes an expert opinion to the extent "the officer knows, from investigating *other* transactions or conspiracies, that certain words, while seemingly innocuous to the untrained ear, generally bear hidden meanings when they are used in certain situations." (Emphasis in original.) *Loggins*, 2019 IL App (1st) 160482, ¶ 91.

¶ 55     Applying the foregoing framework to the facts before it, the *Loggins* court determined that the opinions offered by the detective constituted expert testimony and he should have therefore been qualified as an expert before the testimony was allowed. *Loggins*, 2019 IL App (1st) 160482, ¶¶ 92-106. Nevertheless, the *Loggins* court went on to hold that the error was harmless. *Loggins*, 2019 IL App (1st) 160482, ¶¶ 107-122. The court explained, "When testimony is improperly admitted as a lay opinion, the error is harmless if the witness was, in fact, qualified as an expert, and thus would have been accepted as an expert by the trial court if so tendered." *Loggins*, 2019

IL App (1st) 160482, ¶ 110. The court observed that the detective had 5 years of specialized experience as a narcotics investigator and had been a police officer for 12 years. *Loggins*, 2019 IL App (1st) 160482, ¶ 111. Further, the detective had completed a course in narcotics investigation at the police academy and had participated in annual field training. *Loggins*, 2019 IL App (1st) 160482, ¶ 111. The *Loggins* court therefore concluded that had the detective been tendered as an expert, the trial court would have accepted him. *Loggins*, 2019 IL App (1st) 1111482, ¶ 113. Thus, the court concluded, any error in admitting the detective's testimony as a lay opinion was harmless. *Loggins*, 2019 IL App (1st) 160482, ¶¶ 111.

¶ 56    In *Jones*, 739 F.3d 364 (7th Cir. 2014), the defendant was convicted of various crimes stemming from the armed robbery of a bank. At defendant's trial, Ralph Spano, a detective who participated in the investigation of the robbery, "provided testimony regarding the characteristics of dye packs." *Jones*, 739 F.3d at 369. Among other things, Spano testified that dye packs are all manufactured by one company; they contain a timing device which could be set to detonate the dye pack within 10 to 30 seconds after it passes the bank's exit; the dye packs instantly burn at 400 degrees and release smoke, tear gas, and red dye; and timers in the dye packs are set based upon the environment of the bank so as to ensure they detonate shortly after the exit from the bank and create witnesses that are outside the facility. *Jones*, 739 F.3d at 367-69. Spano further testified that he had observed a dye pack detonate near a person's skin three to five times in his career. *Jones*, 739 F.3d at 367-68. Among these, Spano observed burns to the genital area and leg caused by dye packs stuffed down pants or placed in pants pockets and a burn through a puffy jacket caused by a dye pack detonating in it. *Jones*, 739 F.3d at 368. Although the government introduced photographs of the defendant's left leg, no government witness testified as to the nature of marks on the leg. *Jones*, 739 F.3d at 368.

¶ 57　On appeal, the defendant argued that his convictions should be vacated because Spano's testimony regarding the dye packs constituted expert testimony and the government failed to follow the requirements for such testimony. *Jones*, 739 F.3d at 368-69. The *Jones* court observed that lay testimony "is based upon one's own observations, with the classic example being testimony as to one's sensory observations." *Jones*, 739 F.3d at 369. The court then explained that "testimony moves from lay to expert if an officer is asked to bring her law enforcement experience to bear on her personal observations and make connections for the jury based on specialized knowledge." *Jones*, 739 F.3d at 369. With these principles in mind, the *Jones* court agreed with defendant in part. *Jones*, 739 F.3d at 369-70. Initially, the court considered Spano's testimony that the dye packs were all manufactured by one company, that they contained a timer which could be set to detonate the dye pack within 10 to 30 seconds of exiting the bank, that the dye packs instantly burned at 400 degrees, and that the timers in the dye packs were set based upon the bank environment as to ensure they would detonate shortly after the exit from the bank to maximize the possibility for witnesses outside the bank. The court concluded that such testimony constituted expert testimony in that it "was based on technical, specialized knowledge obtained in the course of [Spano's] position, and was not based on personal observations accessible to ordinary persons." *Jones*, 739 F.3d at 369.

¶ 58　The court then considered Spano's testimony that he had observed the aftermath of a dye pack exploding near a person's skin on three to five occasions and his description of these encounters. *Jones*, 739 F.3d at 369-70. The court categorized this testimony as lay testimony as it "was nothing more than Spano's recollection of personal observations" and there was "nothing in that testimony that reveals opinions or knowledge that could not equally have been observed by other persons in that situation." *Jones*, 739 F.3d at 370. The court then commented:

"The government could have ventured into the territory of expert testimony here if it had gone one step further and solicited an opinion as to the nature of [the defendant's] scars on his leg. If the government had showed the picture of the leg and asked Spano if based on his observations of past dye pack incidents, those scars were of the type that would be caused by a dye pack exploding, then that would have been the type of testimony dependent on specialized knowledge and experience that falls within expert testimony. The government did not do so, and in fact [the defendant] acknowledges in his brief that the government did not present any testimony that the scars on his legs were burns of any sort." *Jones*, 739 F.3d at 370.

As such, the court held that the testimony by Spano concerning burns caused by dye packs was proper lay testimony, and the court below did not commit error in allowing the testimony to be presented. *Jones*, 739 F.3d at 370.

¶ 59    Turning to the facts of this case, Officer VonHoff testified, over defendant's objection, that the scratches and marks he observed on defendant's body were "defensive wounds from somebody else defending themselves." Defendant contends that this testimony was based on specialized knowledge, and because VonHoff was not qualified as an expert, the trial court erred in allowing the State to elicit such testimony. We agree. In this regard, we observe that VonHoff was not present during the April 5, 2016, altercation between defendant and Martinez. Thus, his testimony regarding the nature of the scratches and marks on defendant's body could not be based on his personal observations of the underlying events. Moreover, VonHoff's opinion regarding the nature of defendant's injuries was not the type of opinion that anyone would have been qualified to offer. Indeed, it is clear that VonHoff's opinion was based on his extensive professional experience as a police officer. VonHoff testified that he has been with the Aurora Police Department for 13 years.

Prior to becoming a police officer, VonHoff trained at the police academy. VonHoff testified that he received "particularized training" in the field of domestic battery at the police academy, as part of his continuing education, and in-house with the department. Moreover, VonHoff testified that he had seen "many types of wounds and injuries" during his 13-year career in law enforcement. Quite simply, VonHoff's testimony was the type of testimony dependent on specialized knowledge and experience that falls within expert testimony. VonHoff's opinion regarding the nature of defendant's injuries was based on his past professional experience in assessing injuries. VonHoff had to apply his prior knowledge and experience in law enforcement to determine the nature of the injuries. In the absence of personal observation, a lay person would be unable to differentiate wounds caused by an attack versus wounds caused by someone defending himself. It was therefore error to allow VonHoff to testify regarding the nature of defendant's injuries without first qualifying him as an expert. The trial court therefore abused its discretion in allowing the State to elicit such testimony from VonHoff without first qualifying him as an expert witness. See Ill. R. Evid. 701 (noting that if a witness is not testifying as an expert, the witness's testimony must not be "based on scientific, technical, or other specialized knowledge").

¶ 60　　The question thus becomes whether the error in allowing VonHoff testimony in the absence of an expert qualification constituted reversible error. As noted above, the *Loggins* court found that the failure to qualify a witness as an expert was harmless where the witness was, in fact, an expert, and would have been accepted as an expert by the trial court if so tendered. *Loggins*, 2019 IL App (1st) 160482, ¶¶ 110-111. As noted above, VonHoff testified about his experience and training in policing, domestic violence, and injuries. While defense counsel did object to VonHoff's testimony on the bases of speculation and "foundation," he did not further elaborate as to the reasons for the objection. Had he done so, we perceive no reasonable possibility that the trial

court would not have accepted VonHoff as an expert on the subject of domestic battery given his education, training, and experience. "In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288 (1990); see also Ill. R. Evid. 702 (eff. Jan. 1, 2011). Surely, the training, education, and experience described by VonHoff "afford him knowledge which is not common to lay persons." *Enis*, 139 Ill. 2d at 288. Thus, we hold that any error in allowing VonHoff to testify as to the nature of defendant's injuries was harmless.

¶ 61                                    III.  CONCLUSION

¶ 62    For the reasons set forth above, we affirm the judgment of the circuit court of Kane County.

¶ 63    Affirmed.